IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHN JOSEPH DOHERTY, who     )
sues by and through the Administrix of     )
his Estate, MARY M. ROMINE,     )
    )
    Plaintiff,     )
    )
    v.     )     CIVIL ACTION NO. 2:13cv804-CSC
    )         (WO)
CAROLYN W. COLVIN,     )
Acting Commissioner of Social Security,     )
    )
    Defendant.     )

**MEMORANDUM OPINION and ORDER**

**I.  INTRODUCTION**

In 2009, decedent John Joseph Doherty[1] ("Doherty") applied for disability insurance benefits pursuant to Title II of the Social Security Act,  42 U.S.C. § 401 *et seq*., alleging that he was unable to work because of a disability beginning on December 31, 2001. (R. 269, 300).  Doherty's insured status expired on December 31, 2006.  (R. 283, 300).  His application was denied at the initial administrative level.  The plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ").  Following the hearing, the ALJ concluded that the plaintiff has severe impairments of "panic disorder with agoraphobia; mild obsessive compulsive disorder; major depressive disorder; Tourette's Syndrome; and alcohol abuse and dependence." (R. 134).  Relying on the testimony of a medical expert, the

---

[1]  Doherty died on July 5, 2013 of subarachnoid hemorrhage and esophageal carcinoma.  *See* Doc. # 11, Ex. 2.

ALJ concluded that

> [i]f the claimant stopped the substance use, the claimant would have the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He has a moderate limitation in the ability to respond appropriately to supervisors; a moderate limitation in the ability to respond appropriately to customers or other members of the general public; no limitation in the ability to use judgment in simple one or two step work-related decisions; moderate limitation in the ability to use judgment in detailed or complex work-related decisions; moderate limitations in the ability to deal with changes in routine work setting; no limitation in the ability to understand, remember, and carry out detailed or complex instructions; a moderate limitation in the ability to maintain attention, concentration or pace for periods of at least two hours; a moderate limitation in the ability to maintain activities of daily living; and no episodes of decompensation, each of extended duration.

(R. 137).

On September 1, 2011, the Appeals Council remanded the claim for resolution of the following issue:

> The hearing decision, Finding 7, indicates that the claimant has the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with additional non-exertional mental limitations.  In describing these mental limitations, the decision uses the term "moderate."  Although "moderate" is defined on page 14 of the decision as meaning an impairment which affects but does not preclude the ability to function, terms such as "none, mild, moderate, marked and extreme" are used at steps two and three of the sequential evaluation in determining the degree of impairment severity.  (See 20 CFR 404.1520a(a),(c)(4) and (d)).  These terms are not used to describe work-related limitations as they do not usefully convey the extent of the claimant's functional limitations.  The residual functional capacity must state in specific functional terms, the actual limitations imposed by the claimant's mental impairments on the ability to perform work-related activities.  (See 20 CFR 404.1520(e) and 404.1545; Social Security Rulings 96-8p and 85-16).

(R. 154).

On remand, the ALJ was directed to

•      Update the records on the claimant's medical condition consistent with the requirements of 20 CFR 404.1512-1513.

•      Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and Social Security Rulings 85-16 and 96-8p).  In so doing, use specific terms that convey the extent of the claimant's work-related mental limitations.

(R. 154-54).

The ALJ held a second administrative hearing on January 19, 2012.  (R. 58).  After the hearing, the ALJ again denied the claim.  (R. 53).  The Appeals Council rejected a subsequent request for review.  The ALJ's decision consequently became the final decision of the Commissioner of Social Security (Commissioner).[2]  *See  Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  The case is now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3).  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to the United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be reversed and remanded to the Commissioner for further proceedings.

---

[2] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

## II.  STANDARD OF REVIEW

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination,[3] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

(1)    Is the person presently unemployed?
(2)    Is the person's impairment severe?
(3)    Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4)    Is the person unable to perform his or her former occupation?
(5)    Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence.

---

[3]    A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

[4]    *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

42 U.S.C. § 405(g); *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Substantial evidence is "more than a scintilla," but less than a preponderance: it "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.,* 363 F.3d 1155, 1158–59 (11th Cir. 2004) (quotation marks omitted). The court "may not decide the facts anew, reweigh the evidence, or substitute . . . [its] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004) (alteration in original) (quotation marks omitted).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## III. THE ISSUES

**A. Introduction.** Doherty was 39 years old on the date of onset and 49 years old at the time of the second hearing before the ALJ. (R. 78). He had completed high school and graduated from college. (R. 93). His prior work experience included work as an "editorial assistant at President and Fellows of Harvard." (R. 95). Following the second administrative hearing, the ALJ concluded that Doherty had severe impairments of "panic disorder with agoraphobia; mild obsessive compulsive disorder; major depressive disorder; Tourette's Syndrome; and alcohol abuse and dependence." (R. 31). The ALJ concluded that Doherty was unable to perform his past relevant work. (R. 50-51). Nonetheless, the ALJ concluded

5

that Doherty was not disabled because "[i]f he stopped the substance use, the claimant would be capable of making a successful adjustment to work that exists in significant numbers in the national economy." (R. 53). Consequently, the ALJ concluded that "the substance use disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if he stopped the substance use." (*Id*.).

**B. The Plaintiff's Claims.** Doherty presents three issues for the Court's review.

1.      The decision of the ALJ was not supported by substantial evidence because it ignored evidence of the claimant's mental incapacity and focused almost entirely on Plaintiff's alleged alcohol abuse.

2.      The decision of the ALJ was contrary to the weight of the evidence wherein the ALJ found that if claimant's alcohol abuse stopped, his remaining impairments would not qualify him as disabled.

3.      The decision of the ALJ was contrary to the weight of the evidence that "objective findings" of medical evidence failed to provide strong support for the claim of disabling symptoms and limitations.

(Doc. # 12, Pl's Br. at 2, 6 & 8).

## IV.  DISCUSSION

An administrative law judge has a duty to develop a full and fair record. *Kelley v. Heckler,* 761 F.2d 1538 (11th Cir. 1985). The ALJ is not free to simply ignore medical evidence, nor may he pick and choose between the records selecting those portions which support his ultimate conclusion without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence. *Marbury v. Sullivan*, 957 F.2d 837, 839, 840-841 (11th Cir. 1992). When there is a conflict, inconsistency or ambiguity in

the record, the ALJ has an obligation to resolve the conflict, giving specific reasons supported by the evidence as to why he accepted or rejected one opinion or record over another. "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits is rational and supported by substantial evidence." *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir. 1981).[5] "Failure to do so requires the case be vacated and remanded for the proper consideration." *Hudson v. Heckler,* 755 F.2d 781, 785 (11th Cir. 1985).

The plaintiff raises several arguments related to this court's ultimate inquiry of whether the Commissioner's disability decision is supported by the proper legal standards and substantial evidence. *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987). However, the court pretermits discussion of the plaintiff's specific arguments because the court concludes that the ALJ erred as a matter of law, and, thus, this case is due to be remanded for further proceedings. As will be explained below, the court concludes that the ALJ failed to fully and fairly develop the record concerning what would be the severity and effect of the plaintiff's **panic disorder with agoraphobia** before considering his alcohol use. At a minimum, the record demonstrates that there exists a conflict or ambiguity in the evidence regarding the extent and duration of the plaintiff's mental impairments, including his panic disorder with agoraphobia. Accordingly, the court concludes that the decision of the

---

[5] *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Commissioner should be reversed and this case remanded to the Commissioner for further proceedings.

### A. Doherty's Medical Treatment until last insured date of December 31, 2006.[6]

During the administrative hearings, Doherty testified that symptoms of Tourette's Syndrome began manifesting as early as October, 1997. (R. 67). He further testified that he experienced a "psychotic break" at the end of 1997. "[A]fter the Turrent's (sic) syndrome emerged in '97, it culminated in a horrible year, and then – well, it, it led to a horrible year, culminating in a, a psychotic break." (R. 69). He further testified that between 2001 and 2006, he experienced anxiety around people and could not leave his house. (*Id.*) He was previously hospitalized for panic disorder with agoraphobia and "social anxiety." (R. 70). During his administrative hearings, Doherty repeatedly testified that he could not leave his house due to his agoraphobia. (R. 71-72, 74,  99, & 100-01).

In the spring of 1998, Doherty was living and working in Massachusetts. He became delusional, paranoid and fearful of his safety. (R. 759) When describing his condition in May 1998, Doherty reported that he either avoided or "hid out" in his house. (*Id.*) His condition worsened, and in late July 1998, he became so fearful that he fled to Alabama **where he was hospitalized for a week**.[7] (*Id.*) While it is undisputed that Doherty was

---

[6]   The court recognizes that there are records of additional medical treatment. However, the plaintiff's insured status expired on December 31, 2006. Consequently, to succeed on his claim for disability insurance benefits, Doherty must establish disability prior to the date of last insured.

[7]   Doherty returned home to his parents who lived in Montgomery, and shortly after his return, his parents had him hospitalized. (R. 759).

hospitalized, it is unclear from the record whether he was hospitalized for delusional thinking, paranoia, a mental breakdown, psychotic break or detoxification from alcohol. For example, an August 1998 treatment note indicates that Doherty was admitted to the Emotional Health Center in Montgomery, Alabama. (R. 759). In addition, a later treatment note from Baptist Health in Montgomery, Alabama indicates that Doherty was "admitted to Meadhaven Inpatient psychiatric unit[8] in 1998 for panic disorder, anxiety and paranoid delusions." (R. 418, 586, 420, 588, 422, 590). That same medical record indicated that Doherty had never been treated for substance abuse. (*Id.*) On the other hand, Dr. Mitchell noted that Doherty was admitted and underwent alcohol detoxification in July 1998. (R. 765). Unfortunately, no medical records related to this 1998 hospitalization are included in the record before the court. As a result of this hospitalization in Alabama, Doherty was prescribed Zeferex which treated his delusional thinking. (*Id.*) He was diagnosed with anxiety and panic disorder, delusional disorder and psychotic disorder, NOS. (R. 760, 764).

Upon his release from Meadhaven in Montgomery, Alabama, Doherty returned to his home and his employment in Massachusetts. In August of 1998, Doherty presented to the Harvard University Health Services Mental Health Department. (R. 759). On August 12, 1998, Doherty was seen by Dr. Regina Mitchell. (R. 765). Doherty reported to Dr. Mitchell that he was only drinking a few beers each day, although he reported drinking more on the weekend, between 6 and 12 beers. (*Id.*).

---

[8] Meadhaven Inpatient psychiatric unit is affiliated with Baptist Health in Montgomery, Alabama.

On August 18, 1998, Doherty participated in a psychotherapy session with Dr. Dinklage, PhD.  (R. 759-60).  At that time, Doherty reported the following.

> This staff assistant (accounts) in Econ Dept became paranoid in end of May, delusionally interpreting ordinary things and especially fearing certain acquaintances in Salem (where he has lived for 5 years) were out to get him. He feared for his safety and sometimes hid in his house; other times avoided his house.  He was OK at work but in late July he became so afraid that he flew home July 27 to his parents who in a few days got him into the Emotional Health Center where he had a week of residential care & started on Zeferex. That brought his delusional thinking under control & he returned to work (he told his employer he had panic attacks).  Actually he has had life long problems with phobias.  He has not driven his car for 7 months and can't tolerate crowded stores and malls.  Dr. Mitchell rewrote his Rx for Zeferex & will follow his meds.  I will see him for psychotherapy.  He is planning to sell his house (bot (sic) it 1 yr ago) & move home to Montgomery, Ala.

(R. 759).

On September 1, 1999, Doherty was seen at the Harvard Vanguard Medical Associates.  (R. 828).  Doherty was diagnosed as suffering from depressive disorder, alcohol abuse, and salivary secretion disturbance.  (*Id*.)

> The patient is a 37-year old man whose history is most notable for hypersalivation.  He was evaluated by Dr. Diamond of the ENT for this, with a benign exam earlier this year.  The patient is here because of this continual problem.  Apparently, after his boss at work returned from 2 weeks off, he found the patient's office quite unkept and strongly urged him to seek medial (sic) attention.  I do not have any more details regarding this, but in talking with the patient further, he does have a significant psychiatric history.  He reports being hospitalized last summer due to symptoms of paranoia and briefly being treated with Zyprexa.  Most recently, the patient feels most upset about the death of his ex-girlfriend from a hypercoagulable disorder 2 months ago.  Since that time, he has been feeling more fatigued, has lost roughly 10 pounds, and feels very anxious.  At times, he feels sad and very nervous.  He denies suicidal ideation.

> After spending time on the internet, the patient has come to the conclusion that he may be suffering from mercury poisoning. He feels this is possible because of mercury content in his dental fillings and that this could be associated with hypersalivation and some mental disorders.
>
> . . . The patient appears very anxious. He is somewhat tremulous. . . .
>
> In discussing alcohol intake with the patient further, he states that he drinks 6-12 beers per day but denies any withdrawal symptoms when not drinking. I am concerned about this patient and strongly urged him to seek attention in the mental health department which he declined. He again states that he is not suicidal, . . . At his request, I will send off a mercury blood level, which, undoubtably, will be normal.

(R. 828-29).

Doherty returned to Harvard Vanguard Medical Associates on March 10, 2000, complaining of panic attacks. He was diagnosed with panic disorder w/o agoraphobia and salivary secretion disorder. (R. 823). It was noted that Doherty had a long history of "panic disorder with secondary severe globus hystericus reaction with neck tightening and difficulty swallowing." (*Id.*) Doherty reported using "alcohol to control his globus agoraphobia in the past." (*Id.*) He was prescribed Klonopin.

On April 14, 2000, Doherty reported "doing great on Klonopin." (R. 822). He was "not afraid to go out." He had cut back on his drinking and was feeling **less** anxious and depressed. (*Id.*) (emphasis added).

In December 2000, Dr. James Miller diagnosed Doherty with panic disorder with agoraphobia. Although Doherty was described as a moderate drinker at this time, he still reported suffering from the effects of the panic disorder with agoraphobia. (R. 819-20).

11

> [L]ongstanding panic and agoraphobia disorder which causes him to get
> excessive salivation requiring constant spitting in anxiety provoking social
> situations. He has been able to control this some with the use of bid to tib
> Klonopin but still has to spit a lot at work. We discussed starting Paxil at this
> time to see if this would help even more and he would like to do this.

(R. 819).

Dr. Miller noted that Doherty was anxious during the examination. (*Id*.)

In 2001, Doherty lost his job at Harvard. (R. 70). He stayed in Massachusetts for "a couple of years, and then sold [his] house and moved back to Alabama." (*Id*.) In 2004, he sought treatment from Dr. Saeed Shah in Montgomery, Alabama. On December 3, 2004, Doherty underwent an initial assessment because he was experiencing panic episodes. (R. 542). Doherty was anxious and dysphoric. (R. 543). He reported that he used to be very social but now was "socially anxious." It was very difficult for him to "go to a grocery store and do shopping. He avoids crowds. He does not socialize." (R. 542). Although Doherty admitted to drinking six cans of beer a night, he agreed to cut back and/or stop drinking. (R. 544). Dr. Shah diagnosed Doherty with "panic disorder with agoraphobia, obsessive compulsive disorder, mild to moderate, major depressive disorder, recurrent, mild to moderate, and alcohol abuse, rule out dependence." (R. 544). Dr. Shah prescribed Klonopin and Lexapro to relieve Doherty's anxiety, panic and agoraphobia. (*Id*.; R. 541).

On January 3, 2005, Doherty presented to the Baptist Health Emergency Room complaining of moderate depression. The ER physician record noted alcohol abuse. (R. 430). The diagnostic impression on intake was alcohol dependence, alcohol withdrawal,

panic disorder with agoraphobia, rule out obsessive compulsive disorder, chronic alcoholism **and chronic mental illness**.  (R. 419, 587, 421, 589, 423, 591) (emphasis added).  The initial treatment plan included detoxification, Lexapro, and Neurontin, "[i]n anticipation of increased anxiety post detoxification."  (R. 421, 589, 423, 591).  During his hospitalization, it was noted that Doherty had "a history of significant panic disorder which has been exacerbated by his alcohol dependence."  (R. 416).  Doherty reported "panic attacks since October of 1997."  (R. 418, 586).  A treatment note reflected past psychiatric history of admission to "Meadhaven Inpatient psychiatric unit in 1998 for panic disorder, anxiety and paranoid delusions."  (*Id*.)  Doherty was discharged on January 7, 2005.  (R. 427, 595, 597).

In January 2006, Doherty relapsed on alcohol.  (R. 400, 577).  He was admitted to Baptist Health for depression and alcohol detoxification.  (R. 398, 575).  During this hospitalization, Doherty "had minimal withdrawal symptoms on very few doses of Librium."  (*Id*.)  He was prescribed Clonidine for his Tourette's disorder as well as Lexapro and Neurontin.  (*Id*.)

**B.  Substance Use Disorder and Alcohol Abuse.**  During the first administrative hearing, the medical expert, Dr. Sydney Garner, testified that

> [t]he record would indicate during the time period of consideration that the claimant has suffered from features and symptoms consistent with panic disorder, **with agoraphobia**, mild obsessive/compulsive disorder treated with medication, mild to moderate major depressive disorder.  And there is mention of Tourette (sic) treated with medication.  Throughout the time period of consideration there's also significant alcohol abuse and dependence that has required one admission for detoxification in 2005.

(R. 108) (emphasis added).

When asked by the ALJ whether Doherty's impairments, individually or in combination, met or equaled any listing prior to December 31, 2006, the expert, unfortunately, did not directly answer the ALJ's question.

> A.    I would state that while I do believe that there is again the true, underlying anxiety disorder, the panic disorder with agoraphobia which results in some depression here, if I look at the overall record, especially the treatment record during this time, I would believe that 12.09 is material and contributory to the function –
>
> Q.    Okay, let's break that up into two separate parts.  The first, does he meet or equal a listing considering everything?
>
> A.    Yes, okay, so to simplify, yes, in my opinion, 12.09.[9]
>
> Q.    Okay.
>
> A.    12.09 being material and contributory to 12.06,[10] and really 12.04[11] (INAUDIBLE).
>
> Q.    Based upon your experience, education and training, and your review of the medical record in this case, can you tell me with degree and medical probability when the claimant's medical condition reached the level of severity you've just described?
>
> A.    **I see that he was first diagnosed and received treatment 12/2004,** with all of the diagnoses I mentioned.

(R. 108-09) (footnotes added).

---

[9] Listing 12.09 of the Listings of Impairments relates to Substance Addiction Disorders.

[10] Listing 12.06 of the Listings of Impairment relates to Anxiety Related Disorders.

[11] Listing 12.04 of the Listings of Impairment relates to Affective Disorders

Although on remand the ALJ secured additional medical records from 1998 through 2000, at the second administrative hearing, the ALJ did not have the medical expert testify or even review the new records. The ALJ explained the lack of additional expert testimony in his opinion. "Dr. Garner was not present at the hearing that was held on January 19, 2012. **However, I find that the evidence received into the record after the remand did not provide any new or material information that would significantly alter finding about the claimant's functional limitations.**" (R. 31) (emphasis added). Relying on the expert's testimony from the first hearing, the ALJ concluded that "[i]f the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically or equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)." (R. 33). In reaching this conclusion, the ALJ opined that if Doherty stopped using alcohol, he would have the residual functional capacity to perform work at all exertional levels but he had nonexertional limitations to be considered. (R. 34-35). Consequently, the ALJ concluded that the plaintiff was not disabled. (*Id.*)

However, the ALJ failed to properly apply the law when he did not follow the sequential analysis before considering whether the plaintiff's alcohol abuse was a contributing factor to the disability determination. *See Doughty v. Apfel*, 245 F.3d 1274, 1279 (11th Cir. 2001); *Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001); *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001). The governing regulations require the Commissioner to *first* determine whether the plaintiff is disabled *before*

considering whether his alcoholism is a contributing factor material to disability.  *See* 20

C.F.R. § 404.1535.  *See also POMS Section DI* 90070.050B1 ("Follow the general disability

case development and evaluation process . . . to decide whether the individual is disabled.")

> The implementing regulations make clear that a finding of disability is a
> condition precedent to an application of § 423(d)(2)(C).  20 C.F.R. §
> 416.935(a).  The Commissioner must *first make a determination that the
> claimant is disabled*.  *Id*.

*Drapeau*, 255 F.3d at 1215 (emphasis added).

> *If a claimant is disabled*, but has evidence of drug addiction or alcoholism, the
> ALJ must determine whether the drug addiction or alcoholism is a contributing
> factor material to the determination of the finding of disability.  20 C.F.R. §
> 404.1535(a).  *In making this determination, the ALJ considers whether the
> claimant is disabled without the drug addiction or alcoholism*.  20 C.F.R.
> 404.1535(b)(1).  *The ALJ considers which of the disabling conditions would
> remain should the claimant stop using drugs or alcohol*.  20 C.F.R. §
> 404.1535(b)(2).  If the ALJ determines that the claimant's remaining
> limitations would not be disabling, the ALJ will find that the drug usage or
> alcoholism is a contributing factor material to the determination of disability.
> 20 C.F.R. § 404.1535(b)(2)(i).  Drugs and alcohol are a contributing factor
> material to the determination of disability when they form *the exclusive basis*
> for the finding of disability.  *If there are other grounds for finding the claimant
> disabled, then drugs and alcohol are not a contributing factor material to the
> determination of disability*.  20 C.F.R. § 404.1535(b)(2)(ii).

*Englert v. Apfel*, Case No. 97-1526-CIV-ORL-18C, 1999 WL 1289472, at *8, n.3 (M.D. Fla.

June 16, 1999) (emphasis added).  *See also, Deters v. Comm'r of Social Sec.*, 301 Fed.Appx.

886 (11th Cir. 2008).

Only after the ALJ concludes that the plaintiff is disabled, should the ALJ then

consider whether the plaintiff's alcoholism is a contributing factor material to the disability

determination.  In this case, the ALJ focused on Doherty's alcohol abuse, and improperly

conflated the disability finding with the materiality finding.  The ALJ did not determine whether Doherty was disabled without consideration of his alcohol abuse.  Because the ALJ did not consider whether Doherty was first disabled, his finding that Doherty's alcohol abuse was a contributing factor material to disability is incorrect as a matter of law.  Consequently, the court concludes that the ALJ improperly interjected Doherty's alcohol abuse into the sequential analysis.  Thus, the ALJ failed to properly apply the law, and his finding that Doherty was not disabled before December 31, 2006 because of his alcohol abuse is not supported by substantial evidence.

The ALJ then compounded his error by relying on Dr. Garner's testimony from the first hearing without seeking expert medical testimony to consider the additional medical records submitted on remand.[12]  Dr. Garner testified that Doherty's impairments reached a level of severity to meet Listing 12.09 in December 2004 because that was when Doherty was **"first diagnosed and received treatment**."  (R. 109) (emphasis added).  While it is unclear to what treatment Dr. Garner was referring, what is abundantly clear from the record is that Doherty was treated for psychiatric problems long before 2004.  The medical records from 1998 and 2000, which Dr. Garner did not review, clearly demonstrate that Doherty was experiencing anxiety issues and agoraphobia as early as 1997.  It is apparent from the records that Doherty was hospitalized in 1998 for  delusional thinking, paranoia, anxiety and other mental illness.  The records further highlight Doherty's difficulties in social settings, his

---

[12]  Incredibly, at one point in his opinion, the ALJ finds that "[n]o medical expert has concluded that, without substance abuse, the claimant's impairments meet or equal a listed impairment."  (R. 33).

inability to leave his house, and his social anxiety.  However, in light of her testimony regarding the nature of his panic disorder, the medical records may have changed the expert's opinion.

> A.   Alcohol exacerbates [the panic disorder with agoraphobia], certainly it exacerbates it.  Typical panic disorder usually has, in most cases, an underlying genetic component as well.
>
> Q.   Okay.
>
> A.   But there's also a debate whether or not alcohol (INAUDIBLE).
>
> Q.   All right.  So if the evidence should show that the panic attacks with agoraphobia predates the alcohol, that would help show exactly what caused, what caused the panic attack in the first place, panic disorder in the first place?
>
> A.   I'm not sure I'm following you.  Are you saying would that – to the fact that this may be an underlying genetic mental illness?
>
> Q.   Yes.
>
> A.   Well, certainly I do believe that in this case that that (sic) illness is present (INAUDIBLE).

(R. 113).

Psychologists deal with quintessentially subjective information with respect to which they must exercise professional, interpretive judgment.  By failing to seek expert medical testimony regarding the nature and effects of Doherty's panic disorder and agoraphobia prior to December 2004, the ALJ improperly substituted his judgment and interpretation of the plaintiff's mental condition for that of the medical expert.  *See generally Marbury*, 957 F.2d at 840.  Thus, the ALJ erred as a matter of law when he relied on Dr. Garner's inaccurate and

incomplete testimony.

Furthermore, the ALJ failed to properly develop the record regarding the effect of Doherty's panic disorder with agoraphobia on his ability to work.  Without developing the record more fully regarding the plaintiff's panic attacks with agoraphobia before considering whether Doherty's alcohol abuse was a contributing factor, the ALJ could not make an informed decision based on the record before him, and thus, his decision is not supported by substantial evidence.  Therefore, in light of the inadequate development of the record, the court cannot determine whether the ALJ's determination that the plaintiff is not disabled is correct.  Accordingly, the court concludes that this case should be remanded to the Commissioner for further proceedings consistent with this opinion.

At this juncture, Doherty is deceased, and the court has carefully considered whether to remand this case for further proceedings or an award of benefits.  However, the court refrains from deciding on the present record whether the plaintiff's mental impairments meet or equal the Listings because it is within the province of the Commissioner to determine whether the plaintiff's impairments rise to the level that render him disabled.  The court reminds the Commissioner that "Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000).

> The SSA is perhaps the best example of an agency that is not based to a significant extent on the judicial model of decisionmaking.  It has replaced normal adversary procedure with an investigatory model, where it is the duty of the ALJ to investigate the facts and develop the arguments both for and

> against granting benefits; review by the Appeals Council is similarly broad. *Id*. The regulations also make the nature of the SSA proceedings quite clear. They expressly provide that the SSA "conducts the administrative review process in an informal, nonadversary manner." 20 C.F.R. § 404.900(b).

*Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000).

Accordingly, this case will be reversed and remanded to the Commissioner for further proceedings consistent with this opinion. It is further

ORDERED that, in accordance with *Bergen v. Comm'r of Soc. Sec.*, 454 F.3d 1273, 1278 fn. 2 (11th Cir. 2006), the plaintiff shall have sixty (60) days after he receives notice of any amount of past due benefits awarded to seek attorney's fees under 42 U.S.C. § 406(b). *See also Blitch v. Astrue*, 261 Fed. Appx. 241, 242 fn.1 (11th Cir. 2008).

A separate final judgment will be entered.

Done this 16th day of January, 2015.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE